UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x
                        :

ARTHUR NIGRO,
        Petitioner,           :

        -v.-               :     11 Civ. 5150

UNITED STATES OF AMERICA,       :

                        :

        Respondent.
                        :
- - - - - - - - - - - - - - - - - - - - - x


### MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO ARTHUR NIGRO'S PETITION PURSUANT TO  28 U.S.C. § 2255

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States
    of America


MIRIAM E. ROCAH
JONATHAN KOLODNER
Assistant United States Attorneys

   - Of Counsel -

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to Arthur Nigro's motion to vacate, set aside or correct his sentence pursuant to Title 28, United States Code, Section 2255 (the "Motion").[1]   In his Motion, Petitioner alleges ineffective assistance on the part of his counsel, Louis Cherico, Esq. In addition, Nigro claims that his untimeliness for his petition should be excused because of "newly discovered evidence."  (Br. at 20).  For the reasons that follow, Nigro's claims should be rejected by the Court as untimely and meritless.

## BACKGROUND

### A.   Nigro's Conviction and Sentence

#### 1.   Indictment

At the time of Nigro's plea, he was charged in S20 08 Cr. 06 with racketeering in violation of Title 18, United States Code, Section 1962 and specifically, with the predicate acts of extortion and participation in a loansharking scheme.

#### 2.   Nigro's Guilty Plea

Nigro pleaded guilty on May 18, 2007, pursuant to a plea agreement, to a one-count superseding information (the "Information") which charged him with extortion, in violation of

---

[1] For citation purposes, "Br." refers to the brief accompanying the Motion.  Nigro's Motion was initially filed in June 2011, pursuant to Fed. R. Crim P. 60.  At the Court's suggestion, Nigro refiled the Motion on July 11, 2011 in its current form.

Title 18, United States Code, Section 1951.  The Information charged that, in or about November 2001 up to and including in or about December 2002, Nigro and others "used threats of violence and economic harm in an attempt to force Victim-1 to rent a particular commercial property to Nigro and others at a below market price."  The plea agreement, provided that "the parties agree that the defendant's Guidelines sentencing range is 51 to 63 months, Zone D (the 'Stipulated Guidelines Sentence')." (5/17/2007 Plea Agreement ("Plea Agr.") at 2-3).  The parties further agreed that "neither a downward nor an upward adjustment or departure from the Stipulated Guidelines Range set forth above is warranted." (Plea Agr. at 3).  The plea agreement further provided an explicit waiver of Nigro's appellate rights and Section 2255 rights should he receive a sentence of 51 to 63 months: "It is further agreed (i) that the defendant will not file a direct appeal from, nor litigate under Title 28, United States Code, Section 2255 and/or Section 2241, any sentence within or below the Stipulated Guidelines Range set forth above (51 to 63 months)." (Plea Agr. at 4).

At Nigro's plea proceeding on May 18, 2007, Magistrate Judge Henry B. Pitman asked Nigro whether he had reviewed his plea agreement with his attorney before signing it and Nigro responded that he had.  (Tr. at 4).  Judge Pitman also explained in detail the constitutional rights Nigro would be waiving upon entering a guilty plea.  (Tr. at 15-17).  Nigro stated he was pleading guilty because he was in fact guilty.  (Tr. at 17).  Nigro also

explained his crimes to the Court in his own words, stating that from November 2001 through December 2002,

> accompanied by an implied threat of bodily injury, I asked the owner of a commercial realty property to rent that property to another person known to me at a rate below what the owner was asking, believing that he would acquiesce due to the implied threat of force form someone who was with me and who was an acquaintance of mine.

(Tr. at 17).  Nigro also stated under oath that he was satisfied with Cherico's representation of him. (Tr. at 9).

Based on Nigro's physical appearance, his demeanor, and his answers to the questions, Judge Pitman found that Nigro was "fully competent and capable of entering an informed and voluntary plea, that he [was] aware of the nature of the charge and the consequences of the plea, that the plea is knowing and voluntary, supported by an independent basis in fact as to each of the essential elements of the offense."  (Tr. at 19).   Judge Pitman therefore recommended that Your Honor accept the plea, which Your Honor subsequently did.

### 3.   Sentencing

On September 28, 2007, Your Honor sentenced Nigro principally to a term of 51 months' imprisonment.  No appeal was filed.

### B.   The Investigation and Charges Against Cherico

Indictment 08 Cr. 786 (CM) (the "Cherico Indictment") was filed on or about August 20, 2008.  On February 16, 2010, the Cherico Indictment was unsealed and case was assigned to the

Honorable Colleen McMahon.  On or about February 17, 2010, Cherico was arrested by the Federal Bureau of Investigation ("FBI").  Trial against Cherico is scheduled to commence on October 11, 2011.

Cherico is charged in the Indictment with participating in a mortgage fraud scheme centered on the purchase of multi-million dollar homes in Westchester County from in or about July 2002 through in or about the end of 2002.  In sum, the Cherico Indictment alleges that Cherico served as the attorney for various of the co-conspirators during the fraudulent real estate investment scheme and, in that role, negotiated and closed fraudulent purchases and sales that were part of the scheme.  The Indictment also charges Cherico with conspiracy to obstruct justice, obstruction of justice and money laundering in connection with his role in using the sale of a specific property to hide the assets of a co-conspirator, Dominick Devito, in connection with Devito's sentencing on federal charges United States v. Pasquale Parello, et al., 01 Cr. 1120 (RLC).

As part of the Cherico investigation, on or about October 16, 2007, a Special Agent with the Federal Bureau of Investigation, Michael Lewis, served a subpoena for documents on Cherico at his law office in White Plains, New York, by giving the subpoena to Cherico's receptionist. (See Affidavit of Michael Lewis, attached as Ex. A).

4

The Cherico Indictment was the culmination of an extensive grand jury investigation into a course of fraudulent conduct by Cherico and his co-conspirators involving properties in Westchester.  The investigation resulted in a series of indictments, returned between November 2006 and August 2008 charging a total of six defendants, including Cherico.[2]  As part of the investigation of Cherico, between December 2007 and July 2008, a potential cooperating witness (the "CW"), who was close friends with Cherico, recorded several phone conversations and in-person meetings with Cherico.  During those conversations, Cherico made admissions about his participation in DeVito's mortgage fraud scheme.  See United States v. Cherico, 769 F. Supp. 2d 560, 564-65 (S.D.N.Y. 2011).

The same day the Cherico Indictment was returned, the Government submitted a four-page sealed ex parte letter to United States Magistrate Judge Michael H. Dolinger ("Sealing Letter") seeking to keep the Cherico Indictment under seal because of safety concerns relating to the CW who was still active in another, unrelated, investigation regarding the murder of a Genovese Crime Family Capo in 2003 in Springfield, Massachusetts. That investigation (the "Springfield murder investigation")

---

[2] The other defendants, charged in 06 Cr. 1089 (BSJ), were Louis Cordasco, Jr., John Liscio, Robert Didonato, Dominick Devito, and Daniel Forbes.  Forbes died in 2009. All other defendants pleaded guilty.

centered on Nigro and several other Genovese members and
associates.  Magistrate Judge Dolinger so ordered the Sealing
Letter the same day, thereby sealing the Indictment.  Between in
or about 2007 and January 2010, the CW provided information and
cooperated actively with the Government, in the Springfield
murder investigation by, among other things, (1) making
consensual recordings related to the Springfield murder and other
racketeering acts, including gambling and loansharking; (2)
picking up money related to illegal gambling activity; and (3)
making consensual recordings with a member of the Genovese
Organized Crime Family who was incarcerated.

In or about October 2008, the CW was temporarily disabled by
a medical condition and consequently reduced his level of active
cooperation for several months.  Under the direction of the FBI,
the CW temporarily reduced his level of active cooperation while
he recuperated, but did so with the express understanding that
the CW would return to the CW's previous level of active
cooperation once the CW's health improved.  After several
months, the health of the CW improved and the CW was able to
return to the CW's previous level of active cooperation,
including making additional recordings in the Springfield murder
investigation.  In or about Fall 2009, the FBI began to plan for
the CW to end his active cooperation, to enter a guilty plea, and
to be moved to a secure location.  The decision to have the CW
plead guilty was based in part on the possibility that the CW

6

would testify in a trial that was scheduled to begin in March 2010 in the District of Massachusetts that involved charges related to the Springfield murder.

On or about December 29, 2009, the CW pled guilty in the Southern District of New York in a sealed proceeding, pursuant to a cooperation agreement.  On or about January 15, 2010, the CW was moved to a secure location.

On or about February 11, 2010, a grand jury returned a sealed, superseding indictment, S1 09 Cr. 1239 (PKC), charging Nigro, and five other defendants, with racketeering crimes including the Springfield Murder (the "Nigro Murder Indictment"). The Nigro Murder Indictment was based, in part, on information provided by the CW and evidence gathered by the CW during his active cooperation.

On February 16, 2010, the Cherico Indictment was unsealed.  On or about February 17, 2010, the FBI arrested the six individuals charged in the Nigro Murder Indictment and Louis Cherico in a coordinated operation.[3]  In a Decision and Order dated February 24, 2011, Judge McMahon found that Judge Dolinger had properly sealed the Cherico Indictment in order to protect

---

[3] The Nigro defendants and Cherico were arrested on the same day in order to preserve operational security for all of the planned arrests.  Trial commenced against Nigro and his codefendants on March 14, 2011, and ended on April 1, 2011, when the defendants were convicted by a jury on nearly all counts and Racketeering Acts in which they were charged, including the Springfield Murder.  United States v. Nigro, S5 09 Cr. 1239 (PKC).

the CW's undercover work in the Springfield Murder investigation
against Nigro.  See Cherico, 769 F. Supp. 2d at 568-69.

## DISCUSSION

In his Motion, Nigro contends that his conviction should be
vacated because, during plea negotiations and at the time of his
guilty plea and sentencing, Cherico had a conflict of interest
that adversely affected his representation of Nigro.
Specifically, Nigro alleges that Cherico had a conflict of
interest because at the time of his representation of Nigro,
Cherico was being investigated by the Office of the United States
Attorney for the Southern District of New York and was eventually
charged by this Office with mortgage fraud, obstruction of
justice and money laundering.  In fact, Nigro claims that the
"the acts of Cherico for which, he was arrested tangentially were
associated with the indictment of the defendant," (Br. at 18),
thereby creating a per se conflict.  Finally, Nigro argues that
the untimeliness of his petition should be excused because of
"newly discovered evidence" (Br. at 20).  As explained below, (1)
Nigro's Motion is untimely; and (2) Nigro has not identified a
per se, actual or potential conflict of interest on Cherico's
part because there is no evidence that Cherico was aware of the
investigation against him before October 16, 2007 (after Nigro's
conviction became final), the investigation and charges against
Cherico were unrelated to the charges against Nigro, and
Cherico's representation of Nigro was more than satisfactory.

8

I.    **Nigro's Motion Is Time Barred.**

A.    **Applicable Law**

A motion filed under 28 U.S.C. § 2255 is timely if filed
within one year of the date upon which the judgment of conviction
becomes final, or within one year of "the date on which the facts
supporting the claim or claims could have been discovered through
the exercise of due diligence." 28 U.S.C. 2255(f)(4). Where, as
here, a petitioner relies on newly discovered evidence, the
statute of limitations period runs "when the facts supporting the
claim or claims presented *could have been* discovered through the
exercise of due diligence . . . regardless of whether petitioner
actually discovers the relevant facts at a later date." Wims v.
United States, 225 F.3d 186, 188 (2d Cir. 2000) (emphasis added).
"A petitioner whose claim is based on newly discovered evidence
has the burden of showing that he could not have discovered such
evidence earlier with due diligence." Carter v. Connell, 2007 WL
1526406 *7-8 (N.D.N.Y. May 23, 2007) (citing United States v.
White, 972 F.2d 16, 20 (2d Cir. 1992)).

B.    **Discussion**

Nigro states, without any support, that his motion -- filed
several years after his judgment became final in October 2007 --
should be allowed because he could not have discovered Cherico's
alleged conflict sooner. (Br. at 20). Because Nigro's Motion
was filed in June 2011, he would have to show that he could not
have discovered, with the exercise of due diligence, the facts

9

underlying his motion, namely this Office's investigation of
Cherico, prior to June 2010.  It is clear, however, that Nigro
could have discovered these facts when the Cherico Indictment was
unsealed and Cherico was arrested in February 2010 -- four months
earlier.  Indeed, Nigro tellingly fails to state that he and his
co-defendants were arrested in a coordinated takedown with
Cherico in February 2010 and charged in the Springfield murder
case -- thus plainly placing Nigro on notice that Cherico had
been charged as well.  Moreover, Nigro fails to even describe how
he came to "discover" the existence of the investigation and
indictment of Cherico.  Clearly, given the factual record, the
mere assertion by Nigro that he could not have discovered the
factual predicate underlying his ineffective assistance claim
earlier than one year prior to the date of his filing -- July
2010 -- fails to satisfy his burden of proving due diligence.

In short, the alleged factual predicate of Nigro's
ineffective assistance claim based on a conflict of interest
could have been discovered, with the exercise of due diligence,
in excess of one year prior to the filing of the present motion.
Accordingly, Nigro's motion is time-barred.

## II.  Nigro's Claim That His Conviction Should Be Vacated Or That A Hearing Should Be Ordered Because Counsel Had A Conflict Of Interest Should Be Rejected.

Nigro claims that his conviction should be reversed or that
an evidentiary hearing should be ordered should be rejected

10

because it is clear from the record that Cherico did not have any type of conflict at the time of his representation of Nigro.

## A.   Applicable Law

### 1.   Conflicts Of Interest Generally

The Sixth Amendment provides a criminal defendant with the right to the effective assistance of counsel. This right includes "the right to representation by conflict-free counsel." United States v. Schwarz, 283 F.3d 76, 90 (2d Cir. 2002).  There are three types of conflicts of interest that may result in the deprivation of the effective assistance of counsel: (1) a per se conflict; (2) an actual conflict that adversely affects the attorney's representation of a defendant; and (3) a potential conflict that results in prejudice to the defendant, which is analyzed under the traditional ineffectiveness standard set out in Strickland v. Washington, 466 U.S. 668 (1984).  See Armienti v. United States, 313 F.3d 807, 810 (2d Cir. 2002); United States v. John Doe No. 1, 272 F.3d 116, 125 (2d Cir. 2001); see also United States v. Peterson, 233 F. Supp. 2d 475, 489-92 (E.D.N.Y. 2002) (analyzing alleged conflict to determine whether it met any of three standards).

In the Second Circuit, per se conflicts have been found only in two classes of cases: where trial counsel "is not authorized to practice law" and where trial counsel "is implicated in the very crime for which his or her client is on trial."  Armienti v.

11

<u>United States</u>, 234 F.3d 820, 823 (2d Cir. 2000); <u>see</u> <u>Solina</u> v.
<u>United States</u>, 709 F.2d 160, 164 (2d Cir. 1983) (unlicensed
attorney); <u>United States</u> v. <u>Cancilla</u>, 725 F.2d 867, 868-70 (2d
Cir. 1984) (attorney implicated in client's crime).  A per se
conflict requires "automatic reversal without a showing of
prejudice."  <u>United States</u> v. <u>John Doe No. 1</u>, 272 F.3d at 125;
<u>see</u> <u>Armienti</u> v. <u>United States</u>, 234 F.3d at 823.

 The per se rule is only invoked, however, where the
attorney's criminal activity is closely related to the charged
crimes of the defendant.  Where the attorney's criminal conduct
"involves a completely different substantive crime and is
factually and temporally distinct" from the client's conduct, the
per se rule does not apply.  <u>United States</u> v. <u>Levy</u>, 25 F.3d 146,
157 n.8 (2d Cir. 1994) (finding counsel's criminal involvement in
bail jumping by client's co-defendant not sufficiently related to
invoke per se rule).

 By contrast, in order to prevail on a claim of an actual
conflict, a defendant must first show that an actual conflict
between him and his counsel existed and then must also
demonstrate that the conflict adversely affected his counsel's
performance. <u>Armienti</u> v. <u>United States</u>, 313 F.3d at 811.  An
actual conflict exists when "during the course of the
representation, the attorney's and defendant's interests diverge
with respect to a material legal or factual issue or to a course
of action."  <u>United States</u> v. <u>Schwarz</u>, 283 F.3d at 91 (applying

12

standard derived from <u>Cuyler</u> v. <u>Sullivan</u>, 446 U.S. 335 (1980)).
To show divergent interests, "[s]peculation is not enough."
<u>Triana</u> v. <u>United States</u>, 205 F.3d 36, 42 (2d Cir. 2000).  Nor is
a "mere theoretical division of loyalties" sufficient.  <u>Mickens</u>
v. <u>Taylor</u>, 535 U.S. 162, 171 (2002).

An actual conflict adversely affects an attorney's
performance when a "lapse in representation" resulted from the
conflict.  <u>Armienti</u>, 313 F.3d at 811; <u>see also</u> <u>Cuyler</u> v.
<u>Sullivan</u>, 446 U.S. 335, 336 (1980); <u>Amiel</u> v. <u>United States</u>, 209
F.3d at 199.  "That is, the defendant must demonstrate that some
plausible alternative defense strategy or tactic might have been
pursued," but was not, "and that the alternative defense was
inherently in conflict with or not undertaken due to the
attorney's other loyalties or interests." <u>Armienti</u>, 313 F.3d at
811; <u>see also</u> <u>United States</u> v. <u>Feyrer</u>, 333 F.3d 110, 116 (2d Cir.
2003).

Claims of a conflict that do not fall into the categories of
per se conflicts or actual conflicts are potential conflicts and
are evaluated exactly as any other claim of constitutional
ineffectiveness.  <u>See, e.g.</u>, <u>Armienti</u> v. <u>United States</u>, 234 F.3d
at 824.  The defendant seeking to show a potential conflict must
satisfy the traditional standard established by <u>Strickland</u> v.
<u>Washington</u>, 466 U.S. 668, 688 (1984).

13

### 2.    The **Strickland** Test

To prevail on a claim of ineffective assistance of counsel, a defendant must: (1) demonstrate that counsel's performance fell below an "objective standard of reasonableness" under "prevailing professional norms;" and (2) "affirmatively prove prejudice" from the alleged dereliction in counsel's performance.  Strickland v. Washington, 466 U.S. 668, 687-88, 693-94 (1984).  Only if both of these elements are satisfied can the petitioner demonstrate that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. at 687.

In evaluating counsel's performance, "a reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  United States v. Venturella, 391 F.3d 120, 135 (2d Cir. 2004) (internal quotation marks omitted).  Judicial scrutiny of counsel's performance "must be highly deferential," Strickland v. Washington, 466 U.S. at 689, particularly when considering matters of trial strategy, which reviewing courts are "ill-suited to second-guess."  Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) (internal quotation marks omitted).  In making judgments about the effectiveness of counsel, the Second Circuit has "declined to deem counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox, or downright

ill-advised." Tippins v. Walker, 77 F.3d 682, 686 (2d Cir. 1996).

As to the second prong of the Strickland test, in order to demonstrate prejudice, a defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 693-94. A defendant cannot establish prejudice by showing merely that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." Id. at 693. While Strickland's prongs are often described sequentially, a reviewing court need not consider the first prong before turning to the second. "The object of an ineffectiveness claim is not to grade counsel's performance," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." Id. at 697.

## B.    Discussion

### 1.    There Was No Conflict Between Nigro and Cherico

Nigro appears to allege all three types of conflict in his petition: per se, actual, and potential. None of these arguments has merit.

With respect to Nigro's allegation of a per se conflict, Nigro does not -- and cannot -- satisfy the requirement that the conduct for which Cherico was investigated and charged

15

was "closely related" to the conduct at issue in Nigro's case
before Your Honor.  Indeed, Nigro appears to acknowledge as much,
as he only alleges that "[t]he acts of Cherico for which, he was
arrested tangentially were associated with the indictment of the
defendant [sic]." (Br. at 18).  Even assuming this were true, of
course, it would not satisfy the standard for a per se conflict.
See Fulton, 5 F.3d at 611 ("[o]f course, the *per se* rule does not
apply any time a court learns that an attorney may have committed
a crime; the attorney's alleged criminal activity must be
sufficiently related to the charged crimes to create a real
possibility that the attorney's vigorous defense of his client
will be compromised."); see also United States v. Williams, 372
F.3d 96, 104 (2d Cir. 2004)(stating that *Fulton* court held "that
where it is alleged that defense counsel engaged in the same or
similar crimes for which the defendant stood trial, the conflict
'so permeates the defense that no meaningful waiver can be
obtained'") (quoting *Fulton*, 5 F.3d at 613).

Moreover, Nigro's assertion that Cherico's criminal conduct
was even "tangentially" related to Nigro's in this case is simply
wrong.  Cherico was charged with participating in a mortgage
fraud scheme involving the sale of residential homes in
Westchester County from July through December 2002 with five co-
conspirators.  Nigro's conduct, involving a completely different
co-conspirator, was an on-going extortion of a victim who owned a
commercial building in Harlem, New York in 2001 and 2002.  Thus,

16

these facts do not implicate the per se rule, because Cherico's
criminal conduct "involves a completely different substantive
crime and is factually and temporally distinct" from the client's
conduct.  See Levy, 25 F.3d at 157 n.8 (2d Cir. 1994) (finding
counsel's criminal involvement in bail jumping by client's
co-defendant not sufficiently related to invoke per se rule).

Nigro fares no better in alleging that Cherico had an actual
conflict, because there is no claim that Cherico knew about this
Office's investigation of him at the time that he was
representing Nigro in the case before Your Honor.  Therefore,
there can be no claim that Cherico's and Nigro's interests
diverged.  See Armienti, 313 F.3d at 813-14 (no divergence of
interests where defense counsel did not believe he was under
investigation at the time that he represented the defendant).
Nigro presumes that Cherico knew that he was being investigated
by this Office, stating that "Cherico did not want a trial which
would have exerbated [sic] his criminal investigation."  (Br. at
18).  However, the only plausible date by which Cherico knew that
he was being investigated by this Office was the date on which he
was served with a subpoena by the FBI -- October 16, 2007, more
than a month after Nigro's sentencing. Therefore, no conflict
could have arisen during Cherico's representation of Nigro.

### 2.   Nigro's Claim That His Trial Counsel Was Constitutionally Ineffective Lacks Merit

Nigro claims that Cherico "literally forced [him] to plea

17

[sic] guilty . . .[and] assured a minimal sentence" and complains
that the sentencing enhancements under the plea agreement were
not explained to him. (Br. at 18). Nigro's conclusory and
utterly vague claim -- made in one sentence -- is frivolous.
Given the nature of his assertions, of course, Nigro could have,
and should have, raised this claim of ineffective assistance
earlier, since these complaints are unrelated to his anThe Plea
Agreement made crystal clear that Nigro agreed to be sentenced to
a sentence of 51 to 63 months, and agreed not to appeal or
collaterally challenge such a sentence. Nigro confirmed, under
oath, that he had reviewed the plea agreement with counsel, and
was satisfied with Cherico's representation of him. Furthermore,
he also confirmed that he was basing his decision to plead guilty
simply on the promises set forth in the written agreement,
without reliance on promises or predictions from anyone at all.
(Tr. at 17). Moreover, Nigro was initially indicted as a member
and Acting Capo of the Genovese Organized Crime Family on
racketeering charges and was charged with extortion and
loansharking. Cherico successfully negotiated a favorable plea
for Nigro to a stand alone extortion charge. Given this record,
Nigro's conclusory and self-serving claim now that he pled guilty
because of unspecified representations by Cherico that contradict
everything he said under oath at the plea cannot withstand
scrutiny. See Harris v. New York, 2005 WL 1925435, at *3
(S.D.N.Y. Aug. 10, 2005) ("Harris's claim cannot satisfy the

18

first prong of the <u>Strickland</u> test because it is conclusory and contradicts his sworn statements at the plea allocution."); <u>Accord</u> <u>Blackledge</u> v. <u>Allison</u>, 431 U.S. 63, 74 (1977); <u>United States</u> v. <u>Juncal</u>, 245 F.3d 166, 171 (2d Cir. 2001).

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny the Motion.

Dated:   New York, New York
         September 6, 2011

                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney

         By:   _____/s/_____
                    Miriam E. Rocah
                    Jonathan Kolodner
                    Assistant United States Attorneys
                    Tel. (212) 637-1081/2561

19

## DECLARATION OF SERVICE

MIRIAM E. ROCAH deposes and says:

1.  I am an Assistant United States Attorney for the Southern District of New York.

2.  On September 6, 2011, I served a copy of the foregoing Government's Memorandum of Law in Opposition to Arthur Nigro's Petition Pursuant to 28 U.S.C. § 2255 upon:

> Arthur Nigro
> 58732-054
> MCC
> 150 Park Row
> New York, NY 10007

by causing it to be placed in one of my Office's boxes for outgoing United States mail.

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.

Dated:     New York, New York
           September 6, 2011


           ___/s/_____
           MIRIAM E. ROCAH

20

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - x
                                         :
ARTHUR NIGRO,
            Petitioner,                  :    <u>Affirmation</u>

            -v.-                         :    11 Civ. 5150

UNITED STATES OF AMERICA,                :

                                         :
            Respondent.
                                         :
- - - - - - - - - - - - - - - - - - - - x


STATE OF NEW YORK            )
COUNTY OF NEW YORK           :    ss.:
SOUTHERN DISTRICT OF NEW YORK)

        MICHAEL LEWIS pursuant to Title 28, United States Code, Section 1746,

hereby declares under penalty of perjury:

        1.      I am a Special Agent of the Federal Bureau of Investigation ("FBI").

Since November 2009, I have been assigned to a Counter Terrorism Squad.

Previously, for approximately five and one-half years, I was an agent on the Genovese

Organized Crime Squad. Our principal responsibility was to investigate the illegal

activities of LCN in the New York City area and, specifically, criminal activity involving

members and associates of the Genovese Organized Crime Family of LCN.

        2.      In October 2007, I was involved in an on-going investigation of,

amongst others, Louis Cherico.   As part of my involvement in that investigation, I

served a subpoena for documents on Louis Cherico, Esq., at his law office in White

Plains New York, by giving the subpoena to Cherico's receptionist.   A copy of that

subpoena and the accompanying rider are attached as Exhibit (1) to this affirmation.

The return date on the subpoena was October 23, 2007.

        3.     I have reviewed my calendar from 2007, in which I recorded many

of the appointments and activities in which I participated at that time.   Based on that

review, I know that I served the subpoena on Cherico on or about October 16, 2007.


Dated:New York, New York
       August 19, 2011

                             Michael Lewis
                             Special Agent
                             Federal Bureau of Investigation

2